**Roy P. LUCE, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner
of Social Security, Defendant.**

No. 3:06–cv–00120–JAJ.

United States District Court,
S.D. Iowa,
Davenport Division.

Oct. 30, 2007.

Michael Depree, Bowman & Depree, Davenport, IA, for Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

JOHN A. JARVEY, District Judge.

### I. PROCEDURAL BACKGROUND

Plaintiff Roy Luce filed a protective application for Social Security Disability benefits on January 12, 2005 (Tr. 57–59). Plaintiff alleged a date of onset of disability of August 20, 2004 (Tr. 57–59). In a February 18, 2005, Social Security Notice, Plaintiff was found not to be disabled (Tr. 33–36). On March 28, 2005, Plaintiff filed a Request for Reconsideration (Tr. 38). In a May 25, 2005, Notice, Plaintiff was denied reconsideration (Tr. 39–42). On June 6, 2005, Plaintiff filed a Request for a Hearing by Administrative Law Judge (Tr. 43). On December 8, 2005, a hearing was held before Administrative Law Judge (ALJ) John P. Johnson. Plaintiff was present and represented by Michael De-Pree, Esq. George Paprocki, a vocational expert, also testified at the hearing (Tr. 263–319). On June 19, 2006, the ALJ found Plaintiff was not disabled (Tr. 12–21). Plaintiff filed a request for Review of Hearing Decision with the Appeals Council, which was received on June 28, 2006 (Tr. 10). On September 13, 2006, the Appeals Council denied Plaintiff's request for review (Tr. 6–9). On October 27, 2006, Plaintiff timely his complaint in this action pursuant to 42 U.S.C. § 405(g).

### II. FACTUAL BACKGROUND

Plaintiff was 60–years–old at the time of hearing (Tr. 267). He is married and lives with his wife and adult son in Camanche, Iowa (Tr. 11). Plaintiff's educational history includes a high school degree and attendance at some college courses (Tr. 83). For the past 15 years, Plaintiff's work history includes employment as a manager, sales person of automotive and welding equipment, long-haul truck driver, and security guard (Tr. 88). His alleged date of

onset of disability is August 20, 2004 (Tr. 78). On that date, Plaintiff was involved in a semi-truck rollover accident (Tr. 267–68). Plaintiff alleges that he is disabled due to "herniated discs in back, spinal injury due to truck accident" (Tr. 77). At hearing, the ALJ found Plaintiff has the severe impairments of "residual problems from a motor vehicle accident, including, cervical and thoracic disc problems; lumbar spine strain; and degenerative changes of cervical and lumbar spine" (Tr. 20). The ALJ found that Plaintiff does not have an impairment or combination of impairment that meets or medically equals a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (Tr. 20).

### A. *Medical History*

On August 20, 2004, Plaintiff, then 59–years–old, was involved in a motor vehicle accident while driving a semi-truck for Jack Curtis Trucking near Valparaiso, Indiana (Tr. 256). While Plaintiff was maneuvering his semi-truck around a corner at a speed of 10 miles per hour, a tire on the trailer blew out, causing the tractor and trailer to flip over onto the right side (Tr. 256). Plaintiff was suspended by his seatbelt and the seat hit him in the left knee (Tr. 256). Immediately after the accident, Plaintiff was evaluated at Porter Memorial Health Systems in Valparaiso (Tr. 256). Plaintiff was diagnosed with chest wall contusion (Tr. 256). Injuries to the neck, chest, and left shoulder were identified in the report (Tr. 256). Plaintiff's X-rays showed degenerative changes in the lumbosacral spine, an unremarkable pelvis, minor fibrotic changes in the chest, and degenerative changes of the cervical

spine (Tr. 256). Plaintiff was subsequently released from Porter Memorial with symptomatic therapy (Tr. 256).

On August 23, 2004, Plaintiff sought follow-up care from Dr. Timothy P. Millea, M.D., of Davenport, Iowa (Tr. 182).[1] Dr. Millea found that Plaintiff had a left brachial plexus stretch injury, cervical strain, lower thoracic sprain with possible occult fracture, and low back pain (Tr. 182). Upon examination of Plaintiff's cervical spine, Dr. Millea found that Plaintiff had limitations of motion in all planes to less than 25–percent of normal and that Plaintiff was "quite uncomfortable" when he attempted to extend or bend laterally (Tr. 181). Dr. Millea instructed Plaintiff that he thought it best to continue with conservative treatment measures, telling him to take the pain medication he had been prescribed in Valparaiso and to schedule an appointment in a week to ten days (Tr. 182). Dr. Millea told Plaintiff that he may perform a CT scan or MRI on Plaintiff's lower thoracic area at a future point in time when Plaintiff was in less pain (Tr. 182).

On September 3, 2004, Plaintiff underwent a MRI of his thoracic spine per Dr. Millea's orders (Tr. 179). The MRI showed that there was no "obvious fracture of Plaintiff's thoracic spine," but that Plaintiff had sustained a soft tissue injury (Tr. 178). Specifically, the MRI showed:

> Mild mid thoracic degenerative changes involving endplates with broad disc bulges at T7–T8 and T8–T9. The most significant is at T7–T8 where there is a mild compression of the nerve root in the

---

1. Dr. Millea is a board-certified orthopedic surgeon, with a second specialty in orthopedic spinal surgery (Plaintiff's Exhibit No. 1, Clerks No. 6). Plaintiff saw Dr. Millea monthly between August 2004 and July 2005, and once every two months since July 2005

(Tr. 263). Plaintiff also testified at hearing on December 8, 2005, that he was still being treated by Dr. Millea and had an appointment scheduled with him on December 20, 2005 (Tr. 263).

lateral recess as well as on the anterior aspect of the cord. (Tr. 179). Dr. Millea found the results of the MRI not to be "surgically significant" (Tr. 178). On September 9, 2004, after reviewing the MRI results, Dr. Millea gave Plaintiff a prescription for physical therapy (Tr. 178). He also made arrangements for Plaintiff to be seen at Neurology Consultants for electrodiagnostic studies of the neck and left upper extremities (Tr. 178).[2]

On September 16, 2004, Plaintiff underwent an MRI of his lumbar spine (Tr. 177). Specifically, the MRI showed:

1) Moderate spinal stenosis at L3–L4 due to abnormal asymmetric hypertrophic right facet joint degenerative change with ligamentum flavum redundancy and a large broad-based disc bulge causing moderate narrowing of the neural foramina.

2) No focal disc herniation.

3) Mild broad-based disc bulging at L4–5 and L5–S1 with possible small focal annular tear involving the posterior margin of each of these discs and each right paracentral region.

(Tr. 177). On September 17, 2004, Plaintiff underwent electrodiagnostic studies of the neck and upper extremities. On September 20, 2004, Plaintiff presented to Kristen Dunne, P.T., at Bluff Clinic Physical Therapy (Tr. 151). Dunne reported that "[t]he patient presents with significant limitations and functional ability due to pain" (Tr. 151). After assessment, Dunne recommended Plaintiff attend physical therapy three to four times per a week (Tr. 151).

On September 29, 2004, after reviewing the results of Plaintiff's lumbar MRI, Dr. Millea told Plaintiff that the injury to his lumbar spine was not surgically significant (Tr. 176). Dr. Millea noted that the results of Plaintiff's electrodiagnostic studies of his neck and left upper extremities did not show signs of cervical radiculopathy, brachial plexopathy, or neuropathy (Tr. 176). Dr. Millea told Plaintiff that it appeared that he was suffering from "an acceleration/deceleration injury of the spine including the cervical, thoracic, and lumbar levels" (Tr. 176).[3] Dr. Millea recommended that Plaintiff continue participation in physical therapy (Tr. 176). Dr. Millea also referred Plaintiff to Dr. Timothy J. Miller, M.D., for pain management because Plaintiff was experiencing a significant amount of pain (Tr. 176).

On October 5, 2004, after consultation regarding pain management, Dr. Miller administered to Plaintiff an epidural injection at the L5–S1 interspace (Tr. 134). On October 19, 2004, Dr. Miller administered to Plaintiff a second epidural injection at or around the T–8 thoracic disc (Tr. 133). Plaintiff told Dr. Miller that his pain had "markedly improved" since the first injection (Tr. 133). On November 2, 2004, Dr. Miller administered to Plaintiff a third epidural injection at thoracolumbar junction (Tr. 132).

In October and November, Plaintiff participated three times a week in aqua therapy at Bluff Clinic as a part of physical therapy treatment regimen (Tr. 148). In an October 29, 2004, progress report, Bluff Clinic staff reported that Plaintiff had been increasing his performance levels and

---

2. In his report, Dr. Millea explained that he ordered the additional tests for Plaintiff because he suspected that Plaintiff was suffering from a brachial plexus injury (Tr. 178). Dr. Millea suspected that a brachial plexus injury was the source of Plaintiff's pain and weakness in his upper left extremity (Tr. 178).

3. Dr. Millea noted that he believed the acceleration/deceleration injury could have been caused by the "mechanical nature of the injury" and the "significant amount of force imparted to his trunk" (Tr. 176).

intensity of effort by five to ten-percent each week (Tr. 148). On November 8, 2005, Dr. Millea noted that Plaintiff felt he was making slow progress (Tr. 175). Dr. Millea recommended that Plaintiff continue to attend aquatic therapy two to three times a week with eventual progression to land therapy one to times a week (Tr. 175).

At a December 6, 2004, appointment, Dr. Millea noted that Plaintiff said he "lost ground" in his rehabilitation since the previous appointment and that he was experiencing more pain since the transition from aqua to land therapy (Tr. 174). Dr. Millea noted that Plaintiff seemed to be "at somewhat of a stalemate in regards to his functional tolerance for activities" (Tr. 174). Dr. Millea referred Plaintiff to a pain clinic and instructed him to return after his visit to the pain clinic for a follow-up appointment (Tr. 174). In December of 2004, Plaintiff returned to participating in weekly session of aqua therapy after he found land-based therapy to be too painful (Tr. 146).

At a December 27, 2004, appointment, Dr. Millea noted that Plaintiff stated that he was experiencing some improvement in the level of pain after he underwent bilateral sacroiliac joint injections by Dr. Kerry P. Panozzo, M.D., at the pain clinic. Dr. Millea recommended that Plaintiff continue to undergo physical therapy and follow up with Dr. Panozzo (Tr. 173).[4]

At a January 24, 2005, appointment, Dr. Millea noted that Plaintiff felt that he was continuing to make slow, gradual progress regarding the level of pain in his low back, buttocks, and proximal lower extremity (Tr. 172). Plaintiff also stated that his

thoracic pain was unchanged, and his neck was becoming less stiff (Tr. 172).[5] Plaintiff also reported to Dr. Millea that changes in position and prolonged sitting caused pain in his low back and buttocks, as well as numbness in his thighs (Tr. 172). Dr. Millea told Plaintiff to continue with his current course of treatment and advised Plaintiff that he may need to undergo a repeat cervical MRI if his upper extremities continued to be problematic (Tr. 172). At a February 24, 2005, Dr. Millea noted that Plaintiff had increased pain in the neck and shoulder area and increased difficulty with cervical range of motion than in past appointments (Tr. 171). Dr. Millea recommended that Plaintiff undergo a cervical MRI before pursuing physical therapy treatment for the cervical spine (Tr. 171).

On March 10, 2005, Dr. Millea discussed with Plaintiff via telephone the results of Plaintiff's March 7, 2005, cervical MRI (Tr. 168). The results showed

1) Abnormal exam with cord compression at the C5–6 level due to a large central broad-based disc bulge, also narrowing each lateral recess/neural foramen-right greater than left.

2) Right paracentral to lateral C6–7 disc bulge narrowing the right neural foramen.

3) Mild broad-based disc bulging at C3–4 and C4–5.

(Tr. 169). Dr. Millea found that the results were not surgically significant (Tr. 168).[6] Dr. Millea recommended that

---

**4.** Plaintiff received epidural steroid injections from Dr. Panozzo on January 3, January 18, and January 31 of 2005 (Tr. 153–55).

**5.** Dr. Millea noted that while the degree of motion in Plaintiff's neck had improved from previous appointments, it was still below normal (Tr. 172).

**6.** Dr. Millea noted, "We discussed the option of operative care for this but I would have significant difficulties in stating any optimism regards to a quicker improvement with cervical spine surgery" (Tr. 168).

Plaintiff pursue physical therapy for the cervical spine (Tr. 168).

On April 4, 2005, Dr. Millea met with Plaintiff and his wife to discuss Plaintiff's status, treatment, and prognosis (Tr. 167). Plaintiff informed Dr. Millea that he was seeking a second opinion from regarding treatment for his cervical spine, and Dr. Millea's office provided Plaintiff with copies of his MRI scans and other images (Tr. 167). Dr. Millea reiterated his opinion that cervical spine surgery would not be beneficial for Plaintiff (Tr. 167). Dr. Millea also indicated that he did not believe Plaintiff's symptoms would improve dramatically in the near future, and that Plaintiff should look into additional measures for pain management (Tr. 167).

At a April 18, 2005, appointment, Plaintiff reported to Dr. Millea that he was experiencing increased lower back pain. Plaintiff had been unable to aqua therapy for the past two weeks due to a cat bite on his hand, and Dr. Millea suspected the lack of therapy was the cause of Plaintiff's increased pain (Tr. 164). Dr. Millea gave Plaintiff a prescription for hydrocodone and Flexeril for pain management (Tr. 164). Upon Plaintiff's inquiry, Dr. Millea also told Plaintiff that he could utilize physical therapy for his cervical spine to alleviate neck pain (Tr. 164).

At a May 9, 2005, appointment, Dr. Millea reported that Plaintiff appeared to be much more comfortable than he did at his April 18 appointment (Tr. 161). Plaintiff told Dr. Millea that he had resumed his physical therapy regimen (Tr. 161). Plaintiff reported continued back pain in the lumbar, thoracic, and cervical areas of spine (Tr. 161). Dr. Millea recorded:

> It is indeed difficult to expect a significant degree of improvement in the foreseeable future in Roy's case given the length of time his symptoms have been present as well as their lack of significant improvement with rehab.

(Tr. 161). Dr. Millea noted that Plaintiff had been using a trial of cervical traction for his neck, which Plaintiff stated helped with his neck pain (Tr. 161). Additionally, Dr., Millea gave Plaintiff a prescription for a trial TENS unit (Tr. 161). On June 15, 2005, Plaintiff saw Dr. Panozzo to pursue more aggressive pain management (Tr. 247). Dr. Panozzo gave Plaintiff a prescription for methadone and instructed him to call in one week to evaluate the effectiveness of the medication (Tr. 247).

## B. *Subjective Complaints*

In his January 22, 2005, Personal Pain/Fatigue Questionnaire, Plaintiff stated that the pain occurs in three centralized areas-lower back and legs, middle back, and neck, and shoulders (Tr. 106). Plaintiff stated that the pain is constant, varying between very dull and very sharp (Tr. 106). Plaintiff stated that the pain is exacerbated by bending and twisting movement, sitting on hard surfaces, straightening his back or neck, and changes in the weather (Tr. 106). Plaintiff stated that the pain is more severe in the afternoon and evening than it is in the morning (Tr. 106).

Plaintiff stated that his condition makes it difficult for him to dress himself or comb his hair (Tr. 108). Plaintiff stated that when he uses the computer, he experiences pain in his back and numbness in his arms and his legs (Tr. 108). Plaintiff stated that the pain prevents him from engaging in activities he used to enjoy, such as bowling, golfing, fishing, home improvement, and attending church workshops and meetings (Tr. 107). Plaintiff stated that the pain prevents him from helping his wife with household chores, such as cooking meals and doing laundry (Tr. 108). Plaintiff stated that his daily activities consist of showering, driving to aqua therapy, performing aqua therapy, and sitting in the recliner with his feet up (Tr. 109).

Plaintiff stated that the pain makes it difficult to sleep, and that he typically sleeps for about three to three and a half hours each night (Tr. 108). Plaintiff stated that a prescription of hydrocodone helped him to sleep approximately five hours a night, but also left him feeling drowsy during the day (Tr. 108). Plaintiff stated that pain in his back and neck interfere with his ability to focus and concentrate (Tr. 108).

### C. Competing RFCs

#### 1. Disability Determination Services (D.D.S.) Physician's February 16, 2005, Physical RFC Assessment

The D.D.S. physician, who did not examine Plaintiff as a part of his assessment, found that Plaintiff's primary diagnosis was degenerative disc disease of the thoracic spine and a disc bulge at T7–8 and T8–9 (Tr. 186). The physician identified Plaintiff's secondary diagnosis as a disc bulge at L4–5 and L5–S1 (Tr. 186). The physician placed the following exertional limitations on Plaintiff: occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about six hours in an eight hour workday, sit (with normal breaks) a total of about six hours in a workday, and unlimited pushing or pulling (Tr. 187). The physician indicated no other limitations for Plaintiff. The physician explained the above limitations by stating that Plaintiff's injuries were found to be not surgically significant and that Plaintiff repeatedly reported improvement in his condition (Tr. 187–88).

The physician noted that the information in the file is "generally consistent" and "indicates that the claimant has shown steady improvement in his condition" (Tr. 191). The physician also stated that claimant "is compliant with therapy and motivated in physical therapy sessions" (Tr. 191). The physician indicated that with continued treatment, he felt that the claim-ant would be able to perform the activities that he outlined in the RFC assessment by August of 2005 (Tr. 191). On May 23, 2005, state agency medical consultant Dr. Claude H. Koons, M.D., affirmed the February 16, 2005, physical RFC assessment (Tr. 123).

#### 2. Dr. Millea's May 5, 2005, Physical RFC Assessment

Dr. Millea stated that Plaintiff's diagnoses were chronic lumbar, thoracic, and vertebral pain, and that Plaintiff had a fair prognosis (Tr. 157). Dr. Millea stated that Plaintiff's symptoms include spinal pain and limited motion (Tr. 157). Dr. Millea stated that Plaintiff is not a malingerer (Tr. 158). Dr. Millea stated that Plaintiff is capable of performing low stress jobs and that Plaintiff's pain frequently interferes with his attention and concentration (Tr. 158).

According to Dr. Millea, Plaintiff is capable of walking one city block before needing to rest or experiencing pain and that Plaintiff can sit for 20 minutes before needing to change positions (Tr. 158). Plaintiff can stand for five minutes before he needs to change positions (Tr. 159). In an eight-hour workday, Plaintiff can stand/walk for no more than two hours and sit for no more than two hours (Tr. 159). Plaintiff requires a three minute period of walking every 30 minutes during an eight-hour workday and requires a job that permits at-will shifting of positions from sitting, standing, and walking (Tr. 159). Plaintiff will need to take unscheduled 15 to 20 minute breaks every one to two hours (Tr. 159). Plaintiff can rarely lift 10 pounds, never lift 20 pounds, never lift 50 pounds, rarely twist, stoop, or climb stairs, and never crouch or climb ladders (Tr. 160). Dr. Millea estimated Plaintiff will be absent from work as a result of impair-

ment or treatment more than four days a month (Tr. 160).

On May 22, 2006, Dr. Millea submitted a letter regarding his opinions on Plaintiff's ability to work (Tr. 260). In the letter, Dr. Millea stated:

> In my opinion, which is within reasonable degree of medical certainty, Mr. Luce is not employable as a result of his work-related injuries. This includes the opinion that he is not employable even in a sedentary activity position. His activity tolerance is exceptionally limited given the incurred injuries to the cervical, thoracic, and lumbar spine as well as the residual problems related to a brachial plexus injury.

(Tr. 260). Dr. Millea also stated that he had a "very guarded" prognosis for future improvement of Plaintiff's condition and that spinal surgery was not in Plaintiff's best interest (Tr. 260).

### 3. *August 11, 2005, Examination by Dr. Michael L. Cullen, M.D.*

On August 11, 2005, Dr. Michael Cullen, M.D., examined Plaintiff per a request by Amerisafe, Inc., a workers compensation insurance company (Tr. 256). Based on Plaintiff's medical records, medical history, and one physical examination of Plaintiff, Dr. Cullen found that Plaintiff had a zero-percent impairment (Tr. 255). He also found that Plaintiff to be a symptom magnifier (Tr. 259).

### 4. *Scott Jacobs', P.T., November 1, 2005 Functional Capacity Evaluation Summary*

Plaintiff completed a Functional Capacity Evaluation (FCE) at Westgate Physical Therapy in Clinton, Iowa on November 1, 2005 (Tr. 219). Physical Therapist Scott Jacobs found that Plaintiff was capable of performing physical work at the Light level provided that the specific physical demands of the job did not exceed his tested abilities [7] (Tr. 219). Jacobs found that Plaintiff is not capable of returning to his previous employment as a truck driver (Tr. 219). More specifically, Jacobs found that Plaintiff can handle up to 24 pounds on an occasional basis, can frequently handle 15 pounds, and can constantly handle five pounds (Tr. 219).[8] Jacobs' analysis of Plaintiff's Validity Criteria showed that Plaintiff "demonstrated 'good' efforts with all activities," thus indicating that the FCE results are "reflective of his current capabilities to perform work activities" (Tr. 219). Additionally, Jacobs found that Plaintiff's perceived physical capacity [9] corresponds with a Below Sedentary level [10] (Tr. 219). Thus, Jacobs concluded that Plaintiff's perceived physical capacity is inconsistent with his tested abilities (Tr. 219).

---

7. Jacobs' report references the *Dictionary of Occupational Titles, 4th ed. (revised 1991)* for a definition of Light level physical work. According to Jacobs' report, Light level work includes occasional handling of 20 pounds, frequent handling of 10 pounds, and constant handling of negligible weight (Tr. 232).

8. In addition, Plaintiff completed a non-material handling exam. The results showed that Plaintiff could occasionally remain in a seated position, occasionally, remain standing in an upright position at a workstation without moving about, occasionally walk, occasionally climb, never balance, never stoop, rarely kneel, never crouch, occasionally crawl, and occasionally perform overhead reaching (Tr. 227–28).

9. The FCE states "In another study by Troup et al they concluded perceived physical capacities to be more important than directly measured capacities in predicting back problems among industrial workers[.]" (Tr. 223).

10. According to Mr. Jacobs' report, Sedentary level work includes occasional lifting of 10 pounds, and frequent and constant handling of negligible weight.

### D. *Hearing Testimony*

#### 1. Plaintiff's Testimony

Plaintiff testified that he suffers from three types of back pain-cervical, thoracic, and lumbar (Tr. 270–72). Plaintiff testified that the cervical pain extends into his arms and causes his fingers to go numb, making it difficult for Plaintiff to reach forward with his arms (Tr. 271). Plaintiff testified that he has used several different modalities for pain management, including land and aqua therapy up to five times a week, epidural shots, narcotic pain relievers such as hydrocodone and methadone, a TENS unit, and cervical traction (Tr. 268–71). Plaintiff testified that he had weaned himself off of pain medication because he dislikes the drowsiness and disorientation that accompanies the medication (Tr. 26).[11] Plaintiff testified that, at the time of hearing, he was only using the TENS unit for pain management (Tr. 269–71). Plaintiff testified that he uses his TENS unit constantly, and that the pain returns immediately when he removes the unit (Tr. 269–71). When using the unit, Plaintiff testified that his pain is at a level one or two on a scale of ten, with ten being the most severe level of pain (Tr. 270). Plaintiff testified that his pain is constant, and changes only in the level of severity (Tr. 272).

Plaintiff testified that he can stand on his feet for a half an hour before needing a break, that he can walk three or four blocks before needing a break, and that he can sit in a regular chair for 30 to 40 minutes before he needs to change positions (Tr. 294–95). Plaintiff testified that he can not walk as well as he could before the accident (Tr. 183). Plaintiff testified that he can drive short distances of about 30 miles or less, and that he drives an average of 100 miles per week (Tr. 285). The 100–mile driving distance consists mostly of 12–mile trips back and forth to therapy sessions (Tr. 285).

Plaintiff testified that since the accident, he has not been able to lie down in a bed to sleep at night (Tr. 273). Instead, Plaintiff sleeps sitting up in a recliner (Tr. 273). Plaintiff testified that his hand function is "not bad," but that extending his arms in front of him and over his head causes a lot of pain (Tr. 284). Plaintiff testified that he is unable to take a bath, tie his neck tie, and shave because of his shoulder and arm pain (Tr. 297). Plaintiff testified that he has significant difficulty completing household chores that he performed prior to the accident, such as vacuuming, washing dishes, and wiping the counter tops (Tr. 287–88). Plaintiff testified he uses a cane to negotiate stairs, and is able to take only one step at a time (Tr. 288). Plaintiff testified that due to his injury, he can no longer golf, bowl, fish, or perform home maintenance (Tr. 283). Plaintiff testified that his pain interferes with his ability to concentrate (Tr. 285). Plaintiff testified that his past work history includes employment as a truck driver, salesperson for welding and industrial equipment, assistant manager for an automotive parts and repair store, routes salesperson, and security guard (Tr. 276–80, 290–94, 301–02). Plaintiff testified that he was required to lift amounts between 25 pounds and 120 pounds in his employment as a truck driver, sales person for welding and industrial equipment, and assistant manager for automotive parts and repairs (Tr. 277–80). Plaintiff testified that while working as a truck driver for Triple Crown, he was not required to load and unload trucks, but at times helped with unloading the trucks

---

11. Plaintiff testified that he wanted to stop taking pain medications, such as hydrocodone and methadone, because he was taking high dosages (one dose of hydrocodone every four hours) and was concerned about the addictiveness of such medications (Tr. 289)

nonetheless (Tr. 303). Plaintiff testified that Triple Crown required him to be capable of exerting 100 pounds of pull force to uncouple truck trailers (Tr. 303). Plaintiff testified that, as a security guard, he was required to walk between one mile and 1.5 miles once every two hours (Tr. 294). Plaintiff testified that his assistant manager position did not include any supervisory duties over other employees (Tr. 301).

In regards to Dr. Cullen's and Dr. Michael Dolphin's, D.O., statements that Plaintiff was a malinger and a symptom magnifier, Plaintiff testified that he found those statements "interesting" (Tr. 274). Specifically, Plaintiff testified that his treating physician, Dr. Millea, did not find him to be a malinger or symptom magnifier, and that Plaintiff's results on the FCE at Westgate Physical Therapy basically mirrored the restrictions that Dr. Millea placed on him (Tr. 274). Plaintiff testified that he eagerly sought treatment, that he desired to return to work, and that his goal during the FCE was to prove Dr. Millea's restrictions on him to be wrong (Tr. 275, 281).

### 2. *Vocational Expert George Paprocki's Testimony*

In the ALJ's first hypothetical question to VE Paprocki, he asked whether a hypothetical person could perform any of his previous jobs if the hypothetical person is the same age and sex as Plaintiff, has the same medical, educational, and work history as Plaintiff, and has the following residual functional capacity: routine lifting of 10 pounds and never lifting more than 20 pounds, standing or walking for six hours of an eight-hour workday, sitting for six hours of an eight-hour workday, occasional bending, stooping, squatting, kneeling, crawling, or climbing, occasional work with arms but not above the shoulder level, and no work at unprotected heights (Tr. 308–09). VE Paprocki testified that the hypo-

thetical person would be would be capable of employment as a sales representative for automotive parts and supplies, a sales clerk for automotive parts, a store manager, and a gate guard (Tr. 309). VE Paprocki testified that the hypothetical person would be capable of transferring skills that he acquired in past employment to other jobs that meet the hypothetical limitations, such as a service writer in a automotive dealership and a service clerk (Tr. 310). VE Paprocki testified that the hypothetical person would require a 30–day vocational adjustment period once he began any of the above-stated positions (Tr. 309).

In the ALJ's second hypothetical to VE Paprocki, he asked whether a hypothetical person could perform any of his previous jobs if the hypothetical person is the same age and sex as Plaintiff, has the same medical, educational, and work history as Plaintiff, and has the following residual functional capacity: routine lifting of 15 pounds and never lifting more than 24 pounds, standing for 30 minutes at a time, sitting 30 to 40 minutes at a time, walking three to four blocks at a time, occasional bending, stooping, kneeling, and climbing, occasional reaching with arms fully extended, occasional working with arms overhead, no squatting or continuous operation of hand or foot controls, no work at unprotected heights (Tr. 310). VE Paprocki testified that the hypothetical person would not be able to perform any of his previous employment, primarily due to the standing limitation (Tr. 310). VE Paprocki testified that the hypothetical person would be capable of transferring skills that he acquired in past employment to jobs that meet the hypothetical limitations, such as a service clerk and a work order clerk (Tr. 311). VE Paprocki testified that the hypothetical person would require very little

vocational adjustment once he began one of the above-stated positions (Tr. 311).

In Plaintiff's first hypothetical to VE Paparocki, he asked whether a hypothetical person could perform physical work in the light category if the hypothetical person is the same age and sex as Plaintiff, has the same medical, educational, and work history as Plaintiff, and has the following residual functional capacity: occasional lifting of 24 pounds, frequent lifting of 15 pounds, no forward stooping or bending, sitting for a maximum of one-third of the shift, standing for a maximum of one-third of the shift, and walking for a maximum of one-third of the shift (Tr. 312–13). VE Paprocki testified that the hypothetical person would likely not be able to perform light physical work because most jobs do not provide for the periods of sitting, standing, or walking that are described in the hypothetical (Tr. 313).

In Plaintiff's second hypothetical to VE Paprocki, Plaintiff asked whether a hypothetical person could perform any of his previous jobs if the hypothetical person is the same age and sex as Plaintiff, has the same medical, educational, and work history as Plaintiff, and has the following residual functional capacity: occasional lifting of 24 pounds, frequent lifting of 15 pounds, frequent interference with concentration and attention caused by severe pain, sitting for a maximum of two hours of an eight-hour workday, standing for a maximum of two hours a workday, and a 15 to 20 minute break every two hours. VE Paprocki testified that the hypothetical person could possibly retain employment if his break periods coincided with the normal employee break periods (Tr. 316). VE Paprocki testified that an employer would not tolerate an employee who anticipates missing work more than four days a month (Tr. 316).

## III. CONCLUSIONS OF LAW

### A. Scope of Review

 In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. *See Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992); *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1991); *Cruse,* 867 F.2d at 1184; *Taylor v. Bowen,* 805 F.2d 329, 331 (8th Cir.1986). The court must take into account evidence that fairly detracts from the ALJ's findings. *Cruse,* 867 F.2d at 1184; *Hall v. Bowen,* 830 F.2d 906, 911 (8th Cir.1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Cruse,* 867 F.2d at 1184 (quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. *Gunnels v. Bowen,* 867 F.2d 1121, 1124 (8th Cir.1989); *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The five steps are:

(1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4) If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen*, 898 F.2d 1361, 1364 n. 3 (8th Cir.1990) (citing *Yuckert*, 482 U.S. at 140–42, 107 S.Ct. 2287); 20 C.F.R. § 404.1520(a)-(f).

■ "To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. *Id.*

Under the first step of the disability determination analysis, the ALJ found that Plaintiff has not engaged in any substantial gainful activity since the date of alleged onset of disability (Tr. 16). Under the second step, the ALJ found that Plaintiff has severe impairments of "residual problems from a motor vehicle accident, including, cervical and thoracic disc problems; lumbar spine strain; and degenerative changes of cervical and lumbar spine" (Tr. 16). Under the third step, the ALJ found that Plaintiff's impairments are not so severe as to satisfy the requirements of a listed impairment (Tr. 16). Under the fourth step, the ALJ found that Plaintiff is capable of performing his past relevant work as a sales representative for auto parts and supplies, a counter clerk for auto parts, a sales clerk, a service clerk, a manager, and a gate guard (Tr. 20). Thus, the ALJ found that Plaintiff was not disabled at any time during the requested period of disability (Tr. 20).

The ALJ found that Plaintiff had the following residual functional capacity: occasional lifting of 20 pounds and frequent lifting of 10 pounds; stand or walk for six hours of an eight-hour workday and sit for six hours of an eight-hour workday; occasional bending, stooping, squatting, kneeling, crawling, or climbing; occasional work with arms, but not above shoulder level; no work at unprotected heights (Tr. 20).

### C. *Treating Physician*

In his decision, the ALJ awarded no weight to Dr. Millea's May 22, 2006, opinion letter [12] and little weight to Dr. Millea's 2005 physical RFC assessment [13] (Tr. 18).

---

12. Dr. Millea's opinion letter can be found at Tr. 260.

13. A summary of Dr. Millea's physical RFC assessment can be found on pages 10–11 of

The ALJ accorded no weight to Dr. Millea's letter because the ALJ found that it did not meet the requirements of a medical opinion entitled to deference under the regulations (Tr. 18).[14] The ALJ awarded little weight to Dr. Millea's 2005 physical RFC assessment because he found it to be inconsistent with the majority of the objective evidence in the record (Tr. 18). Instead, the ALJ stated that he was in general agreement with the determination of Dr. Koons, who found that Plaintiff was capable of employment (Tr. 18).[15] The ALJ also relied upon the opinion of Dr. Cullen, who found that Plaintiff was not credible and was a symptom magnifier (Tr. 18, 20).[16] Thus, the ALJ did not accord full credibility to Plaintiff's allegations (Tr. 20).

 Plaintiff argues that the ALJ erroneously rejected Dr. Millea's opinion letter and physical RFC assessment because Dr. Millea's opinions are consistent with objective evidence in the record. Additionally, Plaintiff argues that the ALJ applied an erroneous interpretation of *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir.2002) in the analysis of Dr. Millea's opinion letter.[17] To the contrary, Defendant argues that the ALJ's rejection of Dr. Millea's opinion letter and physical RFC assessment are proper because Dr. Millea's opinion is inconsistent with the objective evidence in the record. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir.2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996). *See also Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir.1991)

---

this decision. In the record, it can be found at Tr. 156–160.

**14.** The ALJ stated that Dr. Millea's opinion was not consistent with the majority of evidence in the record and that Dr. Millea had only minimal clinical findings in his records, which fell short of providing adequate support for his opinion (Tr. 18).

**15.** On May 23, 2005, Dr. Koons affirmed a February 16, 2005, physical RFC assessment that was performed by a state agency medical consultant (Tr. 185–93). See pages 9–10 of this decision for a complete summary of the physical RFC assessment.

**16.** Dr. Cullen found that Plaintiff had zero-percent impairment (Tr. 255).

**17.** In *Krogmeier*, the Eighth Circuit Court of Appeals found that "statements that a claimant could not be gainfully employed" do not constitute medical opinions. *Krogmeier*, 294 F.3d at 1023 (quoting *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir.1996) (internal citations omitted)). In *Krogmeier*, the Court affirmed the ALJ's decision to not give the treating physician's opinion controlling weight because substantial evidence existed in the record to show that his opinion and contemporaneous treatment notes were inconsistent. *Krogmeier*, 294 F.3d at 1023.

(holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

### 1. *Dr. Millea's May, 22, 2005, Opinion Letter*

■ In the regulations, a "medical opinion" is defined as:

[S]tatements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(2). "Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case[.]" 20 C.F.R. § 404.1527(e). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(e)(1). "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraph (e)(1) and (e)(2) of this section." 20 C.F.R. § 404.1527(e)(3).

In a portion of his May 22, 2005, letter, Dr. Millea states,

In my opinion, which is within a reasonable degree of medical certainty, Mr. Luce is not employable as a result of his work-related injuries. This includes the opinion that he is not employable even in a sedentary activity position.

(Tr. 260). This Court finds that this portion of the letter is not a medical opinion under the regulations. In this portion of the letter, Dr. Millea offers his opinion that Plaintiff is "unable to work," which is identified in the regulations to be an opinion on an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1) and (3). Thus, the ALJ should not "give any special significance to the source of an opinion[.]" 20 C.F.R. § 404.1527(e)(3). As a result, the Court affirms the ALJ's finding that this portion of the letter is not a medical opinion entitled to deference.[18]

### 2. *Dr. Millea's Physical RFC Assessment*

■ This Court finds that the ALJ's determination to deny controlling weight to Dr. Millea's physical RFC assessment of Plaintiff is not supported by substantial evidence in the record. In his opinion, the ALJ stated that he denied controlling weight to Dr. Millea's physical RFC assessment because 1) it was not supported by objective medical evidence and 2) Plaintiff's daily living activities were inconsistent with an allegation of total disability (Tr. 18). This Court finds that Dr. Millea's physical RFC assessment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citation omitted); *See also* 20 C.F.R § 404.1527(d)(2). Thus, the ALJ should have given controlling weight to Dr. Millea's physical RFC assessment. *See* 20 C.F.R § 404.1527(d)(2).

First, substantial evidence does not support the ALJ's denial of controlling weight to Dr. Millea's physical RFC assessment on the grounds of lack of objective medical evidence. The record is replete with "medically-acceptable clinical and laboratory diagnostic techniques" that support Dr. Millea's physical RFC assessment. *Singh*

---

**18.** In his opinion, the ALJ did not address the other portions of Dr. Millea's letter (Tr. 18). Thus, this Court will not review the unaddressed portions of Dr. Millea's letter.

*v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citation omitted). Since he was injured in a trucking accident in August of 2004, Plaintiff has undergone three MRIs, one each of the thoracic, lumbar, and cervical sections of his spine (Tr. 179, 177, 168). The three MRIs showed abnormalities in each section of Plaintiff's spine (Tr. 179, 177, 168). In addition, at the direction of Dr. Millea, Plaintiff underwent electrodiagnostic studies of his neck and upper extremities (Tr. 176). From the results, Dr. Millea determined that Plaintiff was suffering from "an acceleration/deceleration injury of the spine including the cervical, thoracic, and lumbar levels" (Tr. 176). Dr. Millea determined that the injuries were not surgically significant, and instructed Plaintiff to utilize treatments besides surgery (Tr. 176).

The treatments that the Plaintiff subsequently underwent are significant. To improve mobility and range of motion, Plaintiff participated in physical therapy sessions between two and four times a week (Tr. 151). Staff members at the physical therapy clinic reported that Plaintiff put forth good effort, realized limited improvement, and continued to suffer pain (Tr. 146–48). Dr. Millea referred Plaintiff to a pain clinic to obtain treatment for pain management (Tr. 176). Through the clinic, Plaintiff received epidural injections for pain as well as prescriptions for narcotic painkillers, such as hydrocodone and methadone (Tr. 132–34, 247). At one point in his treatment, Plaintiff was taking four hydrocodone a day (Tr. 289). Plaintiff reported that these methods provided some relief, but the relief was neither complete nor permanent (Tr. 269–70). Dr. Millea also prescribed to Plaintiff a TENS unit and a cervical traction unit (Tr. 161). Plaintiff reported that these methods also provided partial and temporary relief from the pain (Tr. 161, 270).

The ALJ found that Dr. Millea's decision to not recommend surgery counted against lending controlling weight to Dr. Millea's opinion because it demonstrates that Plaintiff's injury was not severe (Tr. 18). However, Dr. Millea indicated in his records that his reluctance to recommend surgery to Plaintiff stemmed from his prognosis that surgery would not be beneficial for Plaintiff's condition (Tr. 167, 260). Dr. Millea did not indicate that his reluctance to recommend surgery was a comment regarding the severity of Plaintiff's condition. In fact, the opposite is true, as Dr. Millea prescribed aggressive tactics, as detailed above, to treat Plaintiff and manage his pain. Especially significant are Plaintiff's use of narcotic pain relievers, such as hydrocodone and methadone, spinal epidurals, and a TENS unit. *See Kelley v. Callahan,* 133 F.3d 583 (8th Cir. 1998) (The Eighth Circuit of Appeals reversed and remanded an ALJ's denial of benefits when the ALJ improperly discredited Plaintiff's subjective complaints of pain and failed to give proper weight to opinion of treating physician. The Court found that the claimant's history of numerous doctor's visits, use of prescription medication, use of TENS unit, physical therapy, trigger point injections of cortisone, chiropractic treatments and nerve blocks substantiated claimant's subjective complaints of pain). The ALJ's denial of controlling weight to Dr. Millea's physical RFC assessment on the grounds that Plaintiff's spinal injury was not severe is not supported by substantial evidence in the record.

Second, the ALJ's denial of controlling weight to Dr. Millea's physical RFC on the grounds that Plaintiff's daily activities are inconsistent with allegations of total disability is not supported by substantial evidence. In his opinion, regarding Plaintiff's daily activities, the ALJ states:

He is able to drive, perform self-care, and help with some household chores. He can vacuum and wash dishes. He indicated at the hearing that in the afternoon he watches television, reads, talks, on the phone, and works on the computer. He often goes for walks. (Tr. 18). The Plaintiff's hearing testimony, responses on forms, and reports to physicians do not support the ALJ's characterization of Plaintiff's daily activities.

In regards to driving, Plaintiff testified that he is able to drive short distances of less than 30 miles (Tr. 285–86). Plaintiff testified that he drives himself 12 miles round-trip to therapy during the week when his wife at work (Tr. 298). He reported that he has difficulty entering and exiting the vehicle (Tr. 109). He testified that his wife drives when she travels with him so he can sit in the reclining seat in the vehicle (Tr. 298). He testified that Dr. Millea expressed concerns about his ability to drive, specifically about whether he could reach the foot pedals or be able to turn the steering wheel (Tr. 286). Plaintiff testified that the maximum amount of time that he could sit upright in a regular sitting position is 30 to 40 minutes (Tr. 295).

In regards to self-care, Plaintiff testified that he needs assistance in shaving, getting dressed, and putting on his tie in the morning (Tr. 284, 297). Plaintiff also testified that he is unable to sit down to take a bath, and must shower instead (Tr. 297). He reported that it is difficult for him to raise his arms in order to wash his hair or comb it (Tr. 108). Plaintiff testified that he uses a cane to negotiate the stairs in his home, and that he can only take one step at a time (Tr. 288).

In regards to helping with household chores, Plaintiff testified that he is able to vacuum the two carpeted rooms in his house when he does so slowly and without any sudden motion (Tr. 288). He testified that his son or wife must plug the vacuum cord into the outlet for him (Tr. 298). In regards to washing the dishes, Plaintiff testified that he is able to wash dishes for ten minutes at a time before having to take a break (Tr. 288). Additionally, Plaintiff reported that he is unable to help with cooking meals or doing the laundry, as he had done prior to the accident (Tr. 108).

In regards to walking, Plaintiff testified that he takes walks for a distance of three to four blocks before having to stop. He also testified that at one point, he could walk one mile in a time period of 40 minutes. Plaintiff testified that he is able to stand on his feet for 30 minutes before experiencing significant pain (Tr. 94). In regards to working on the computer, Plaintiff testified that he can do so for 25 to 30 minutes before he starts experiencing pain in his legs and numbness in his legs and arms (Tr. 298). Plaintiff reported that his back and neck pain interfere with his ability to focus and concentrate (Tr. 108).

Substantial evidence shows that Plaintiff is able, to a limited extent, to perform the activities the ALJ listed in his opinion. However, Plaintiff's hearing testimony, responses on forms, and reports to physicians do not support the ALJ's characterization of Plaintiff's daily activities. Additionally, Plaintiff's utilization of several types of prescription pain management, including narcotic pain medication, spinal epidurals, and a TENS unit, is objective medical evidence that is consistent with the restrictions on activity found in Dr. Millea's physical RFC assessment. The ALJ's denial of controlling weight to Dr. Millea's physical RFC assessment on grounds that Plaintiff's daily activities are inconsistent with an allegation of total disability is unsupported by substantial evidence in the record.

Lastly, this Court takes up the issue of the November 1, 2005, FCE which

stated that Plaintiff is capable of Light level sedentary work (Tr. 219–46). Plaintiff argues that the FCE findings that Plaintiff can lift 24 pounds occasionally, 15 pounds frequently, and 5 pounds constantly support Dr. Millea's physical RFC assessment (Tr. 219). Plaintiff argues that the specific results of the FCE demonstrate that Plaintiff is incapable of performing even light sedentary work, namely that Plaintiff is limited to torso lifting zero pounds from the floor and that Plaintiff can sit, stand, or walk only one-third of a full shift (Tr. 220). Plaintiff also points to the results of the perceived capacities portion of the FCE, which demonstrate that Plaintiff's perceived capacities are less than sedentary (Tr. 223). Defendant argues that the FCE does not support Dr. Millea's physical RFC assessment, as the FCE states Plaintiff can perform light level sedentary work (Tr. 219–46).

This Court finds that the FCE results are another "medically acceptable clinical and laboratory diagnostic technique[s]" that support Dr. Millea's RFC assessment. *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citation omitted). The limitations on Plaintiff that Dr. Millea gave in his RFC assessment, although not exactly the same as those in the FCE, are close.[19] Most significantly, Dr. Millea found that Plaintiff could stand/walk or sit for a maximum of two hours during an eight-hour work day and the FCE results demonstrated that Plaintiff could sit, stand, or walk for a maximum 33–percent of an eight-hour workday, or roughly two and one half hours (Tr. 160, 220). VE Paprocki testified that a person with the limitation of sitting, standing, or walking a maximum of one-third of a full shift would not be capable of performing light level sedentary work (Tr. 313). This Court finds that the FCE results, taken with VE Paprocki's testimony, support Dr. Millea's physical RFC assessment that renders Plaintiff completely disabled. D. *Reversal or Remand*

The scope of a district court's review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides, in part, that:

> [t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> [w]here the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin,* 811 F.2d at 1201–02. *See also Beeler v. Bowen,* 833 F.2d 124, 127 (8th Cir.1987) (although there was no shift in the burden to the Secretary, reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability."); *Stephens v. Secretary of Health, Educ., & Welfare,* 603 F.2d 36, 42 (8th Cir.1979) (reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). If a remand for "further hearings would merely delay

---

**19.** Dr. Millea stated that Plaintiff can rarely lift 10 pounds or less, never lift 20 pounds, never lift 50 pounds (Tr. 160). The FCE results stated that Plaintiff can handle up to 24 pounds on an occasional basis, can frequently handle 15 pounds, and can constantly handle five pounds (Tr. 219). Dr. Millea found that Plaintiff could rarely twist, stoop, or climb stairs, and never crouch or climb ladders (Tr. 160). The FCE results stated that Plaintiff can occasionally climb, never balance, never stoop, rarely kneel, never crouch, occasionally crawl, and occasionally perform overhead reaching (Tr. 227–28).

receipt of benefits, an order granting benefits is appropriate." *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984).

Dr. Millea's physical RFC assessment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000) (citation omitted); *See also* 20 C.F.R § 404.1527(d)(2). Giving Dr. Millea's RFC assessment controlling weight, the record demonstrates that Plaintiff is completely disabled and unable to maintain regular, sustained competitive employment in the national economy. Further hearings would merely delay receipt of benefits. Reversal for an award of benefits is proper in this case.

Upon the foregoing,

**IT IS ORDERED** that the determination of the ALJ is reversed and this matter is remanded for an award of benefits.